## SAFETY CAR HEATING & LIGHTING CO. v. UNITED STATES LIGHT & HEATING CO.

(District Court, W. D. New York. December 10, 1914.)

### No. A–4.

PATENTS ⬯328—INVENTION—CAR LIGHTING SYSTEM.
    The Thomson patent, No. 926,518, for an electric car lighting system, *held* void for lack of invention in view of the prior art.

In Equity. Suit by the Safety Car Heating & Lighting Company against the United States Light & Heating Company. On final hearing. Decree for defendant.

Duell, Warfield & Duell, of New York City (C. H. Duell, F. P. Warfield, H. S. Duell, R. S. Blair, and D. G. Haynes, all of New York City, of counsel), for complainant.

Jones, Addington, Ames & Seibold, of Chicago, Ill., and Kenefick, Cooke, Mitchell & Bass, of Buffalo, N. Y. (W. Clyde Jones, Arthur B. Seibold, and Edwin B. H. Tower, Jr., all of Chicago, Ill., of counsel), for defendant.

Wm. Houston Keynon, Richard Eyre, and Gorham Crosby, all of New York City, for Gould Coupler Co., as amicis curiæ, on the question of patentable novelty of patent in suit.

HAZEL, District Judge. This is an equity action for the infringement of letters patent No. 926,518, granted to William I. Thomson June 29, 1909, on application therefor dated April 15, 1903, for an improvement in railroad car lighting, and particularly in the automatic regulation of the output of the generator which supplies the lamps with electric current. In systems of car lighting of this character, of which

there are several, the current is generated by a dynamo attached by a belt to an axle of the car and rotated thereby at variable speed.

The specification in suit, with the drawing attached thereto, describes a dynamo and a shunt field winding in the main circuit having serially included in its field a pile of carbon disks, or contacting electrodes, pressure on which decreases the aggregate resistance or opposition to the field current, while release of the pressure on it increases the resistance or opposition. In the main current there are also a storage battery, an automatic switch, a lamp circuit extending across the leads, a series coil controlling through a movable core, and a lever apparatus pivoted to control the pressure upon the carbon pile resistance; and reference is made to a dash-pot connected in such a way as to steady the movements of the lever by absorbing sudden shocks and jars, and to a spring arrangement which operates to oppose the attraction of the solenoid. The appended simplified sketch illustrates these features:

But to insure an accurate understanding of the patent in controversy a portion of the specification, referring to the figures in the sketch, is here quoted:

"The function of switch 8 is, as will be obvious from the drawings, to open the circuit through the dynamo 3 and prevent any wasteful discharge of battery 2. The coils of the field magnet or magnets of the dynamo are represented at 10 as shunt-wound, the leads of the shunt circuit being indicated at 11 and 12. Embodied in this shunt field circuit is a variable resistance, which is illustrated as comprising a pile or series of carbon disks or other contacting electrodes 13 located between the plates 14 and 15 to which the leads 11 and 12 are connected. The lower of these plates is stationary, and the upper one is carried by an insulated arm 16 pivotally connected to the end of the lever 17 pivotally mounted at 18. To the other end of this lever is pivotally connected the plunger 19 of the solenoid 9. A retractile spring 20 tends to rock the lever 17 on its pivot, so as to increase the pressure of the plate 14 on the pile of carbon disks, thereby lessening the resistance of such pile and the resistance of the field circuit of the dynamo. There is also preferably provided a means for absorbing any sudden movements or jerks of the lever 17, as a dash-pot 20a having its piston 21 connected to one of the arms of the lever."

According to the evidence, the assembled parts operate in such a way that, when an increased current passes either to the storage battery or to the lamps, there is created an opposition or interference in the flow of the current because of the pull upon the plunger of the solenoid, resulting in relieving the pressure on the carbon pile, and consequently lessening the current in the field circuit bringing the

same to the normal output, while on the other hand when an increase of current supply is required, the strength of the solenoid is diminished by automatic reverse action. The function of the storage battery is, of course, to supply current to the lamps when the car is at rest or when it has decreased its speed to such an extent that the current from the dynamo is insufficient to keep the lamps lighted or to keep them from flickering.

The patent has four claims, all of which are alleged to be infringed by the defendant company. It will suffice to set out claim 1, which broadly describes an automatic regulation of a shunt wound generator. It reads as follows:

"1. In combination, a shunt wound generator having serially included in its field circuit a plurality of contacting electrodes and positively acting electro-magnetic means controlled by the current output of the generator for varying the pressure with which said electrodes contact."

Claim 1 emphasizes three important features: (1) The circuit connection of the variable resistance; (2) the character of the resistance varying apparatus to be employed; and (3) the means for controlling the apparatus. Claims 2, 3, and 4 are limited to a dynamo in a lighting system driven from the car axle.

The defenses interposed are anticipation, prior use, want of novelty, and noninfringement. It is therefore important to ascertain at the outset whether said features were old and commonly known in the art at the date of the invention in suit, and, if so, whether the patentee was the first to combine them in a car lighting system, thereby achieving success which was denied to prior inventors in the same field. It is not doubted that other systems of car lighting in which the generator was driven by the axle of the car were in use before the origin of the Thomson system, nor that the elements of the claims separately considered were old and common expedients for performing their separate functions. Indeed, the defendant claims that the essential elements of the combination had been substantially adapted for use in a car lighting system successfully employed by various railroads. Complainant, however, insists that the assembling of the parts—the generator with the shunt field winding in the main circuit serially connected with the carbon pile—is new and novel, notwithstanding prior devices, in that the said elements or parts were so arranged and interrelated in their action that they achieved a new and useful result which prior systems failed in achieving.

The specific claim of the patentee is that he remedied the defects and inefficiencies in car lighting systems of the type under consideration by the automatic regulation and control of the entire current generated, as distinguished from merely supplying current to the lamps from a storage battery which, quoting from complainant's brief, "required charging on each run, with attendant delay and loss." If the proofs substantiate this claim, and the patentee did solve the problem of overcoming difficulties in the way of efficient car lighting, then beyond doubt his improvement is of great merit and value, and the protection of the patent laws should not be withheld from him or his assignor, the complainant. There is presented by the record, however, a serious ques-

tion as to whether the antecedent patents and prior car lighting systems, wherein the dynamo is driven by the car axle, do not indicate the dominant elements of the combination in suit. The patentability of such combination I conceive is not determinable merely by the existing differences or similarities between it and prior combinations claimed to achieve the identical result, but resort must be had to the functions which are performed by the adapted means and to the principle of operation by which the result is attained. It is well settled that a device which comes into existence by the adaptation of substantially the same means or instrumentalities, operating on the same principle, and achieving practically the same result, is the same device; and as said in Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935:

"A claim in a patent of one such device claims and secures the other."

Keeping this rule in mind, we may continue in our analysis of the claims in dispute.

Throughout the record complainant urges upon the consideration of the court the adaptation of the variable resistance feature positioned serially in the field, instead of in shunt about the field circuit with reversible control—a prior adaptation; the selection by the patentee of a carbon pile resistance, instead of a step by step rheostat, and of a current constant, instead of a voltage constant; the use of a shunt wound generator, instead of one that is series wound; and the selection of a solenoid and plunge device for current control, instead of an ordinary magnet with a fixed core. There is satisfactory evidence in this record to show that a carbon pile rheostat in a car lighting apparatus was not first adapted by Thomson, but that such element is shown in the Moskowitz car lighting system, and is described in the patent issued to him on application dated January 21, 1903, and numbered 746,558. A comparison of the Moskowitz device with claim 1 of the patent in suit discloses the substantial use and adaptation by the former of the various elements of the latter prior to the date of the patent in suit, with the single difference that the carbon pile rheostat or contacting electrodes of the Thomson patent are connected in series and not in shunt about the field winding as in the Moskowitz patent. Reference will again be made herein to the Moskowitz patents, which concededly were reduced to practice before the patent in suit was conceived.

It appears that long before car lighting sytsems were invented the patent to Brush, No. 224,511, of 1880, pointed out the feasibility of substituting a carbon pile resistance for a wire resistance. From similar disclosures in the later patent to Brush, No. 239,313, the patent to Sellon & Mordey, No. 392,370, the earlier patent to Moskowitz, No. 626,713, and the English patent to Sellon & Mordey, it would seem to be clearly shown that before complainant's application for patent the connections of variable resistances, carbon pile or wire, in shunt or in series, controlled by a magnet with current output coil, were old features, recognized by the skilled electricians as equivalents; the operation and co-operation of the various parts also being familiar to skilled electricians. That one kind of resistance possessed advantages not inherent in the other in the way of greater or less consumption of energy

was understood, and hence the manner of the connection, whether in series or in shunt, was regarded as one largely of individual preference. Indeed, in the Sellon & Mordey patent of 1888 the specification substantially states that the variable resistance for varying the field of the generator may be placed around in shunt or in series with the field.

Brush, it is true, used the generator to supply current to an arc light; but the drawings (Figs. 2 and 3) clearly show variable resistances of the wire rheostat and carbon disk types, operating precisely as does the carbon pile resistance of the Thomson patent under consideration, to maintain constant the flow of the current. In Brush patent, No. 239,313, are shown two carbon pile resistances and a constant current regulator which operate automatically. A duplication therefore of carbon piles by Thomson (Fig. 2 of the drawing) is obviously not a new idea or use, unless their adaptation to a car lighting system as distinguished from stationary lighting be so considered.

Afterwards came Edison, with the incandescent lamps placed in parallel and connected in shunt across the main lead. As a preventive of fluctuation of pressure he adapted the magnet in shunt across the mains, obtaining thereby a variation of voltage and division of the current. A comparison of the Brush and Edison lighting patents discloses that Brush, to avoid fluctuation of the current, put the magnet in series in the main lead, while Edison to avoid fluctuation in pressure or voltage placed the magnet in shunt in the field with the result that as only a part of the current passed through it he was enabled to maintain the current constant. To be sure, the patents to Brush and Edison are not anticipatory; but, as hereinbefore indicated, they are pertinent as showing the knowledge that electricians possessed at the date of the patent in suit regarding the various methods of connecting variable resistances—i. e., a wire resistance or carbon disk rheostat, either in shunt or in series.

The patent to Weston, No. 292,715, of 1884, is claimed by defendant to anticipate the patent in suit. Therein are shown a generator and a magnet in series with the main circuit to respond to the variable flow of the current, with a wire rheostat in the field series controlled by a magnet to vary the strength of the field and maintain constant current to the lamps. That the Weston structure, wherein the generator is in shunt as in the patent in suit, was a practical device, is not questioned; and while it was not for a car lighting system, but was used for stationary lighting, still there is such marked similarity of operation between it and complainant's lighting system that it is difficult to overlook its importance as an anticipatory structure. It was used in an analogous art, and had but one essential differentiating feature from complainant's patent, namely, a wire rheostat resistance in place of the carbon pile; and although complainant's patent is for a combination of old elements achieving a new and useful result, it is nevertheless very questionable, I think, whether, in view of the Weston patent, considered in connection with the Moskowitz structure, it involved invention to substitute the carbon pile disk, made known to the art by Brush, for the wire rheostat first placed in the shunt field circuit by Weston.

There is evidence to show that Weston's adaptation was substantially used by Faure in a train lighting system in which a shunt wound generator was driven from the car axle. Faure adapted the shunt wound generator and constant current regulator to supply current to the storage battery and lamps, and used a wire step by step resistance to secure a constant potential; but, as he did not employ a carbon rheostat in the shunt field circuit of the generator controlled by a solenoid in the main lead to secure constant current, he cannot be considered as anticipating the combination in suit.

I now come to what is regarded by both sides as the most important reference in support of defendant's contention that the changes and modifications made by Thomson, after the practicability of the Moskowitz structure was demonstrated, were merely of form and not of substance. It is shown that prior to the date of the application in suit the defendant had installed the Moskowitz structure, in which there was used a shunt wound generator connected to the car axle by a belt arrangement as in the patent in suit. In such structure the dynamo supplied electricity to a circuit in which were placed a storage battery and incandescent lamp in parallel, while the current was maintained practically constant by the adaptation of an automatic regulator, which comprised a magnet included in series in the main circuit, operating upon a carbon pile rheostat in the shunt field circuit of the generator. The single difference between such system of car lighting and that of Thomson was that in the former the carbon pile resistance was not in series about the shunt field winding as in the latter. The question is therefore sharply presented whether, in view of the prior art, there was invention in connecting the carbon pile in series about the shunt field winding.

Complainant argues at length that both Moskowitz and Thomson, at substantially the same time, aimed to solve the same problem which confronted the art in perfecting axle driven car lighting systems, and that Moskowitz by his arrangement, as shown in the patent subsequently granted him, numbered 746,558, and dated December 8, 1903, failed because he adhered strictly to what Brush and the prior art taught regarding variable resistances in shunt with the field of a shunt generator, while Thomson, as counsel states, "devised the radically novel arrangement of a carbon rheostat in serial relation to the shunt field winding of a dynamo," thus controlling the current output of the generator.

In the Ferrand French publication, however, prior to the invention in suit, was described a rheostat of the carbon disk type connected in series in the shunt field circuit with the generator, and it was substantially stated therein that a carbon disk resistance might be connected in series about the shunt field circuit of the dynamo to the operating coil of the magnet, or connected in series in the main circuit, if constant current was to be secured; or it might be connected in shunt with the field if constant voltage was desired. In view of what is shown by Weston, Moskowitz, and Ferrand, it is difficult to conclude that the Thomson adaptation in controversy involved anything more than a change of form. I quite agree, however, that if it were proven

that he succeeded where Moskowitz failed, and made railroad car lighting systems more efficient by removing objectionable features, such as fluctuation of the current and consequent flickering of the lights, then his patent was not devoid of merit, but was of superior value and entitled to corresponding praise, and protection from appropriation by others, notwithstanding Ferrand's suggestions.

There is considerable evidence in the record showing that the Thomson adaptation was not new. Prior thereto, in the year 1900, there was in operation by Faure a system, called the Consolidated Commercial System, which employed a shunt wound generator driven by a belt from the car axle; the generator regulator being of the constant current type, with the belt winding in series and having a step by step resistance controlled by a solenoid in series in the main circuit. About 500 installations of this type had been made at the time of the invention in suit, and, according to the evidence, many more have since been installed. Complainant's criticism is that such system was crude and unsatisfactory, and that the Thomson patent was designed as an improvement thereon; but, if we assume such to have been the fact, we are confronted by other credible witnesses engaged in the railway lighting business who claim that the later Moskowitz system was also commercially successful and was used on the Santa Fé and Lehigh Valley Railroads.

It appears that in 1903 the defendant company installed the Moskowitz system on the Empire State Express and particularly in passenger car 952, where it was used for a period of approximately nine months; the purpose being to demonstrate its efficiency. Such installation was quickly followed by others on said railroad, and there remains no doubt in my mind that the said lighting system with its carbon pile resistance in shunt, and not in series, was successfully operated, and was not objectionable because of any defect in the arrangement of its parts or because of any flickering of the lamps. It is quite possible that complainant's arrangement of parts was simpler and more convenient, and perhaps required less current and less wiring; but any such alterations, improvements, or advantages were not due to invention, but were a change of form only, no new or different result being achieved than had previously been achieved by Moskowitz.

In the Patent Office the Thomson patent was beset by many obstacles, and was allowed only on an appeal to the Court of Appeals. The primary examiner rejected it principally on the patent to Weston, his opinion being that there was no invention in the substitution of the carbon pile for the wire resistance; the board of examiners, and afterwards the Commissioner of Patents, reaching a similar conclusion, but only after thorough examination and analysis of many patents pertaining to the electric lighting art. The Court of Appeals in its opinion expressed doubt on the question of patentability, but was constrained to grant the patent on the ground, as stated therein, that it appeared by affidavits that the use of the wire rheostat in prior car lighting systems was faulty, troublesome, and impracticable, that serious difficulty had been overcome by Thomson, and that no other car lighting system had gone into use. The showing before the Court

of Appeals as to the prior state of the art was incomplete, the particular Moskowitz patent or construction here considered not being before it for consideration, while in the present case it is shown by preponderating evidence that the patent in suit was not of a pioneer character, prior patents being in evidence which bear upon the state of the art, including the Hering and Creveling patents, which, in view of the foregoing, do not require particularization.

My conclusion is that, at the date of the filing of the application for the patent in suit, it did not involve invention to place the carbon pile in series with the field winding, which was an essential feature of complainant's car lighting system. The Moskowitz patent, No. 746,-588, was not granted until after the Thomson conception; but prior use as early as 1903 of the structure therein described is satisfactorily shown, and therefore it did not involve invention to use a carbon disk resistance in series with a variable speed shunt generator to maintain constant current, and Thomson's particular arrangement of such parts and circuits was merely a matter of adaptation.

The bill is dismissed, with costs.